# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

ADVANCE BRANDS, LLC,

     Plaintiff,

vs.

ALKAR-RAPIDPAK, INC.,

     Defendant and Third-Party
     Plaintiff,

vs.

GLEESON CONSTRUCTORS &
ENGINEERS, LLC and PLAINS
BOILER SERVICE, INC.,

     Third-Party Defendants.

No. 08-CV-4057-LRR

**ORDER**

-----------------------

## TABLE OF CONTENTS

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.    **RELEVANT PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . **3**

III.   **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . **4**

IV.   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . **5**

V.    **OBJECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    A.   *Advance Brands's Objections to Alkar's Statement of Facts* . . . . . . . **5**
    B.   *Alkar's Objections to Advance Brands's Statement of Facts* . . . . . . . **6**

VI.   **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **9**

    A.   *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
    B.   *Advance Brands's Orange City Facility* . . . . . . . . . . . . . . . . . . . . **9**
    C.   *Alkar Oven* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    D.   *Alkar Oven Manual* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
    E.   *Advance Brands's Lockout Policy* . . . . . . . . . . . . . . . . . . . . . . . **15**

F.     The Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

G.    Post Incident Investigations . . . . . . . . . . . . . . . . . . . . . . . 19

H.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VII.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.    Applicable State Law . . . . . . . . . . . . . . . . . . . . . . . 20

        1.    Section 145(2) contacts . . . . . . . . . . . . . . . . . . . . . 22

            i.    The place where the injury occurred . . . . . . . . . . . 22

            ii.   The place where the conduct causing the injury occurred . . . . . . . . . . . . . . . . . . . . . 22

            iii.  The place of incorporation and place of business of the parties . . . . . . . . . . . . . . . . . . 23

            iv.  The place where the relationship between the parties is centered . . . . . . . . . . . . . . . . 24

            v.   Summary . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.    Section 6 factors . . . . . . . . . . . . . . . . . . . . . . . . . 26

            i.    The needs of the interstate and international systems . . . . . . . . . . . . . . . . . . . . . 26

            ii.   The relevant policies of the forum and other interested states . . . . . . . . . . . . . . . . . . . . 26

            iii.  Ease of determination and application of the law . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            iv.  Other Section 6 factors . . . . . . . . . . . . . . . . . . 27

    B.    Advance Brands's Products Liability Claims . . . . . . . . . . . . . . . 28

        1.    Manufacturing defect claim . . . . . . . . . . . . . . . . . . . 28

        2.    Design defect claim . . . . . . . . . . . . . . . . . . . . . . . . 29

            i.    Whether alleged defect was part of the Alkar oven . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            ii.   Whether Advance Brands caused the fire . . . . . . . . . 32

            iii.  Whether Advance Brands established a reasonable alternative design . . . . . . . . . . . . . . . . 35

                a.   Products Restatement on defective design . . . . . 35

                b.   Parties' arguments . . . . . . . . . . . . . . . . . . 35

                 c.   First alternative design . . . . . . . . . . . . . . . . 36

                d.   Second alternative design . . . . . . . . . . . . . . 38

         3.    Failure to warn claim . . . . . . . . . . . . . . . . . . . . . . . 39

    C.    Advance Brands's Implied Warranty Claims . . . . . . . . . . . . . . . 42

        1.    Implied warranty of merchantability . . . . . . . . . . . . . . . 42

        2.    Implied warranty of fitness for a

       *particular purpose* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**
    **D.**      **Advance Brands's Negligence Claims** . . . . . . . . . . . . . . . . . . . . **45**
**VIII.**  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

## I. INTRODUCTION

The matter before the court is Defendant/Third-Party Plaintiff Alkar-Rapidpak, Inc.'s ("Alkar") "Motion for Summary Judgment" ("Motion") (docket no. 102).

## II. RELEVANT PROCEDURAL HISTORY

On July 18, 2008, Plaintiff Advance Brands, LLC ("Advance Brands") filed a Complaint (docket no. 2) against Alkar. Count I alleges that Alkar negligently designed, manufactured and installed an oven ("Alkar oven") at an Advance Brands facility in Orange City, Iowa, and that Alkar's negligence proximately caused a fire and explosion at the facility. Count II sets forth a cause of action for products liability. Count III alleges that Alkar breached its implied warranties of fitness for a particular purpose and merchantability when it designed, manufactured and supplied the Alkar oven to Advance Brands. On September 18, 2008, Alkar filed an Answer (docket no. 12) to the Complaint.

On September 21, 2008, Alkar filed a Third-Party Complaint (docket no. 38) against Third-Party Defendants Gleeson Constructors & Engineers, L.L.C. ("Gleeson") and Plains Boiler Service, Inc. ("Plains Boiler"). Alkar alleges that Gleeson and Plains Boiler were responsible for the design and installation of the thermal piping system at Advance Brands, and that, "[i]n the event that liability were to be imposed on [Alkar], . . . Gleeson and Plains Boiler should be held liable in contribution or indemnity for their commensurate degree of fault in causing the alleged damages claimed by Advance Brands in this case." Third-Party Complaint at ¶ 29. On November 9, 2009, Gleeson filed an Answer (docket no. 48) to the Third-Party Complaint. On November 18, 2009, Plains Boiler filed an Answer (docket no. 49) to the Third-Party Complaint.

On March 1, 2011, Plains Boiler filed a "Motion for Partial Summary Judgment"

(docket no. 101) on one issue.  Specifically, Plains Boiler argued that Alkar failed to produce any evidence that Plains Boiler's failure to install temperature or pressure gauges on the supply and return thermal fluid piping lines to each zone of the Alkar oven constitutes negligence, as Alkar alleged in the Third-Party Complaint.  On March 10, 2011, Gleeson filed a Joinder (docket no. 108) in the Motion for Partial Summary Judgment.  On March 18, 2011, Alkar filed a Response (docket no. 109) to the Motion for Partial Summary Judgment, indicating that it did not resist.  On March 31, 2011, the court granted the Motion for Partial Summary Judgment.

On March 1, 2011, Alkar filed the Motion.  On March 28, 2011, Advance Brands filed a Resistance (docket no. 114).  On April 4, 2011, Alkar filed a Reply (docket no. 117).  Alkar requests oral argument on the Motion.  The court finds that oral argument is unnecessary.  The Motion is fully submitted and ready for decision.

## III.  SUBJECT MATTER JURISDICTION

Advance Brands is a Delaware corporation with its principal place of business in Edmond, Oklahoma.[1]  Alkar is a Wisconsin corporation with its principal place of business in Lodi, Wisconsin.  Gleeson is an Iowa limited liability corporation with its principal place of business in Sioux City, Iowa.  Plains Boiler is an Iowa corporation with its principal place of business in Sioux City, Iowa.

The court has diversity subject matter jurisdiction over Advance Brands's claims because complete diversity exists among the parties and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different States").

---

[1] Alkar maintains that Advance Brands is a limited liability company with its principal place of business in Orange City.

4

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  "[T]o establish the existence of a genuine issue of material fact, 'a [non-moving party] may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)).  Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Id.* (quoting *Bass*, 418 F.3d at 873).  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences.  *See Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## V.  OBJECTIONS

### A.  Advance Brands's Objections to Alkar's Statement of Facts

Advance Brands objects to Alkar's Statement of Facts (docket no. 102-1) at paragraphs 47, 48, 66, 85, 86, 104, 107, 109, 110, 119, 120, 121, 124, 127 and 128.  Specifically, Advance Brands contends that paragraphs 47, 48, 66, 85 and 86, are legal conclusions and are not supported by citations to the record.  Advance Brands also states that paragraph 66 is argumentative.  Advance Brands objects to paragraphs 104 and 107 as inadmissible, irrelevant and in violation of the collateral source doctrine.  Advance Brands objects to paragraphs 109, 110, 127 and 128, and alleges that they constitute

argument and are not statements of fact. Advance Brands objects to paragraphs 119, 120 and 121, and maintains that they are argumentative and contain legal conclusions. Finally, Advance Brands objects to paragraph 124, asserting that it fails to state a material fact in violation of Local Rule 56(a)(3).

For the reasons stated in Advance Brands's Response to Alkar's Statement of Facts (docket no. 114-1), the court sustains Advance Brands's objections to Alkar's Statement of Facts as to paragraphs 47, 48, 66, 104, 107, 109 and 110. The court further holds that, even if the information contained in Alkar's statements of fact at paragraphs 104 and 107 is admissible under Federal Rules of Evidence 411 and 402, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice and confusion of the issues, and should be excluded under Federal Rule of Evidence 403. Consequently, the court will not consider Alkar's statements of fact at paragraphs 47, 48, 66, 104, 107, 109 and 110. However, the court overrules Advance Brands's objections to Alkar's statements of fact at paragraphs 85, 86, 119, 120, 121, 124, 127 and 128. The court concludes that these are statements of fact, and do not constitute argument or legal conclusions.

### B. Alkar's Objections to Advance Brands's Statement of Facts

Alkar objects to Advance Brands's Statement of Facts (docket no. 114-2) at paragraphs 16, 17, 23, 26, 28, 31, 36, 40, 46, 47, 48, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 71, 78, 87, 88, 92, 93, 94, 96, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 112, 115, 116, 118, 121 and 123. Specifically, Alkar objects to paragraphs 16, 17, 26, 36, 40, 46, 47, 48, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 87, 88, 92, 93, 96, 99, 100, 102, 103, 104, 105, 106, 107, 108, 109, 112, 115, 116 and 121, arguing that they constitute argument and are not statements of fact as required by Local Rule 56(b)(3). Alkar objects to paragraph 23, alleging that the statement of fact "improperly uses the term 'thermal fluid system' to refer to something inside the oven itself, which is factually inconsistent with the testimony of [Advance Brands's] own witnesses." Alkar's Response

to Advance Brands's Statement of Facts (docket no. 117) at ¶ 23. Alkar objects to paragraphs 28, 31 and 78, arguing that Advance Brands is relying upon the statements of another party's expert witness "without supplying the pages on which [Advance Brands] relies." *Id.* at 31. Alkar further objects to paragraphs 31 and 78 by maintaining that the expert witness Advance Brands relies upon is not a fact witness and has no experience designing thermal fluid systems. Alkar objects to paragraphs 71 and 101, arguing that Advance Brands "purports to be referencing a code," but has failed to reference a code section. *Id.* at ¶¶ 71, 101. Alkar objects to paragraph 94, asserting that "[t]he document attached to Plaintiff's Appendix as Exhibit U is not competent evidence because it was not authenticated," and argues that "it lacks foundation and should be stricken." *Id.* at ¶ 94. Alkar objects to paragraph 118, maintaining that Advance Brands's statement regarding subsequent remedial measures is inadmissible pursuant to Federal Rule of Evidence 407. Finally, Alkar objects to paragraph 123, maintaining that it is beyond the scope of any issues presented in the Motion, and that Advance Brands relies, in part, upon the deposition of an expert who is unqualified "to opine concerning loss issues or costs of oven repair." *Id.* at ¶ 123.

For the reasons stated in Alkar's Response to Advance Brands's Statement of Facts, the court sustains Alkar's objections to Advance Brands's Statement of Facts at paragraphs 16, 17, 26, 36, 40, 46, 47, 48, 58, 59, 60, 61, 62, 64, 67, 68, 71, 87, 88, 92, 93, 94, 99, 100, 101, 102, 108, 109, 112 and 121. The court overrules Alkar's objections to Advance Brands's Statement of Facts regarding paragraphs 63, 65, 66, 96, 103, 104, 105, 106, 107, 115 and 116. These paragraphs constitute "additional material facts that [Advance Brands] contends preclude summary judgment," LR 56(b)(3), and the court will consider them. The court also overrules Alkar's objection to Advance Brands's Statement of Fact at paragraph 23. The court will construe Alkar's "objection" as a denial, because it merely denies the statement in paragraph 23. Furthermore, the court overrules Alkar's objections

to paragraphs 28, 31 and 78.  Advance Brands provided sufficient record citations to support each of these statements of fact, and Alkar provides no authority to support its position that Advance Brands cannot refer to statements made by another party's expert witness in its statement of facts.  The court overrules Alkar's objection to paragraph 123 because Advance Brands's alleged damages are a material issue in this case.  Furthermore, the court rejects Alkar's challenge to Advance Brands's expert witness's qualifications in its Response to Advance Brands's Statement of Facts.  *See* LR 7(e) (noting that a motion should not be filed in a response but "must be filed separately as a new motion").

Finally, the court considers Alkar's objection to Advance Brands's statement of fact at paragraph 118.  Advance Brands states, "Alkar has manufactured Cyclone ovens which contain safeguards to automatically shut down the Cyclone in the event of overpressurization."  Advance Brands's Statement of Facts at ¶ 118.  Pursuant to Federal Rule of Evidence 407,

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction.  This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Under this rule, the court can consider evidence of Alkar's subsequent remedial measures if Advance Brands uses the evidence, not to establish liability, but to demonstrate the feasibility of precautionary measures when contested.  *See e.g.*, Bruce I. McDaniel, *Admissibility of subsequent repairs or other remedial measures in products liability cases*, 74 A.L.R.3d 1001 (1976) (noting that many courts have found "evidence of subsequent modifications or design changes is admissible for the purpose of showing feasibility of

alternate designs"); *see also Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 507 (Iowa 2009) (discussing admissibility of subsequent remedial measures in design defect cases).

Thus, the court will sustain Alkar's objection to the extent Advance Brands uses this evidence to establish Alkar's liability or the existence of a defect in the Alkar oven. However, to the extent Advance Brands presents evidence of subsequent remedial measures to overcome Alkar's argument that a reasonable alternative design does not exist, the court will consider it. *See* Alkar's Memorandum of Law in Support of the Motion ("Alkar Br.") (docket no. 102-2) at 12 (stating Advance Brands's proposed design is "speculative, unreasonable, and fails to support [Advance Brands's] claims in this case"); Advance Brands Br. at 21 (responding to Alkar's argument and stating, "Not only are both alternative designs feasible, Alkar is currently attempting to incorporate both designs into the Cyclone ovens it currently manufactures").

## VI.  RELEVANT FACTUAL BACKGROUND

Construed in the light most favorable to Advance Brands, the undisputed facts are as follows.

### A.  Players

Advance Brands is in the food processing business and owns and operates a food processing facility in Orange City.  Alkar designs and manufactures food processing equipment.  Gleeson is a design/build construction firm.  Plains Boiler's business includes installing and repairing thermal fluid piping systems.

### B.  Advance Brands's Orange City Facility

Advance Brands's Orange City food processing plant contains several different production lines and associated cooking appliances, including cookers, ovens and fryers. Some of the cooking appliances utilize thermal oil fluid to heat the appliances and cook the food products.  Advance Brands has a thermal fluid system that circulates Paratherm oil throughout the Orange City facility in order to heat the cooking equipment.  Included in

the thermal oil system are three Fulton boilers, expansion tanks and pumps used to circulate the oil. In 2001, Advance Brands built an expansion at the facility, adding new ovens, fryers, two thermal fluid powered Stein ovens and other components to create new production lines. Advance Brands employed a company it refers to as Mid-Tech to design the thermal fluid piping system and integrate the components into Advance Brands's system.

In 2005, Advance Brands built another expansion, adding an addition to its plant, or expansion facility, and a new line that included a new breader, batterer, product former, fryer, oven, packaging equipment and refrigeration equipment. On January 4, 2005, Advance Brands contracted with Gleeson to serve as the general contractor on the expansion. Gleeson's scope of work on the 2005 expansion project did not originally include designing the thermal fluid system. Instead, Advance Brands planned to award this aspect of the project to Mid-Tech. Halfway through the project, however, Advance Brands added the design of the thermal fluid system expansion to Gleeson's scope of responsibility. "[Gleeson] designed the expansion of the thermal oil system that was piped to the Alkar oven." Alkar's Appendix of Material in Support of the Motion ("Alkar App'x") (docket nos. 102-3 through 102-17) at 196, Exh. 9. However, Advance Brands maintains that "[t]he design of the thermal fluid piping system was a collaborative effort that included Alkar." Advance Brands's Response to Alkar's Statement of Facts at ¶¶ 13, 27, 36.

Plains Boiler "did some of the piping work related to the expansion of the thermal oil system that was piped to the Alkar oven." Alkar App'x at 196, Exh. 9. Plains Boiler "installed the [t]hermal [f]luid [p]iping [s]ystem pursuant to the Subcontract Agreement entered into between Plains Boiler and Gleeson on May 13, 2005 and design drawings prepared by Gleeson." *Id.* at 212, Exh. 10. Gleeson and Plains Boiler installed isolation valves on the supply and return piping leading to each zone of the Alkar oven in Advance

Brands's mezzanine level, or attic, which was above the ceiling of the oven room. Gleeson and Plains Boiler did not design or install corresponding pressure relief with the isolation valves.

## C.  *Alkar Oven*

Advance Brands contracted with MP Equipment Company to purchase multiple pieces of equipment, including the Alkar oven, for use in its expansion facility.  Advance Brands maintains that negotiations for the sale of the Alkar oven took place in Suwanee, Georgia.  Alkar contends that they took place in Orange City.  On February 18, 2005, Advance Brands faxed a purchase order to MP Equipment Company.  Advance Brands's 2005 expansion project manager, Tim De Larm, signed the purchase order.

The Alkar oven was part of Alkar's Cyclone oven product line.  Alkar also had at least three other oven product lines, including the Wavecon, the Serpentine and the RapidRoast.  Alkar established the Cyclone line when it modified the design of the RapidRoast oven in an effort to create an oven that was easier to clean.  The Alkar oven was a large piece of industrial equipment comprised of five zones, with each zone utilizing a separate control valve operated through a touch-screen control panel, which allowed the user to manage the cooking process.  Alkar designed the Alkar oven to transfer heat to its five zones using Paratherm, the thermal fluid Advance Brands used in its facility.  The five zones are heated by thermal oil that flows through piping and oil-to-air heat exchangers, or coils.  The Alkar oven utilizes a conveyor belt system to load the product into the oven, transfer the product through each of the five zones and move the product to an unloading area.

After Alkar completed the Alkar oven, Alkar shipped it to Advance Brands's Orange City facility.  Advance Brands maintains that "Alkar provided not only the oven and the electrical control panel with corresponding wiring, but also piping, control valves for the piping, a schematic of the external piping, flexible connections which connect the

oven to the [thermal fluid] system, and duct work and exhaust fans[.]" Advance Brands's Brief in Opposition to the Motion ("Advance Brands Br.") (docket no. 114) at 13. Alkar assembled parts of the Alkar oven at the Orange City facility. Alkar employees also spent three or four days at the Orange City facility training Advance Brands's employees about the proper operation and maintenance of the Alkar oven.

Andi Mikelsons was an Alkar employee and the lead project engineer on the Alkar oven at issue in this case. Mikelsons obtained a bachelor of science degree in mechanical engineering from the University of Washington in 1986; however, he does not have a professional engineering certificate in any state. The Alkar oven was only the third Cyclone oven Alkar produced, and it was the first thermal fluid oven that Mikelsons worked on as lead project engineer. It was Mikelsons's responsibility to ensure that the Alkar oven was built to meet applicable codes.

Alkar configured the Alkar oven specifically for Advance Brands. Mikelsons testified that as project engineer, his primary job was to produce equipment for customers based upon their specific requirements. Mikelsons stated that usually involved "starting with an existing design, existing product line and modifying it, making it longer, making it taller, changing the shape as required to match their factory and to match their specific production requirements." Alkar's Supplemental Record of Material in Support of the Motion ("Alkar Supp. App'x") (docket nos. 117-1 through 117-6) at 24.

Alkar did not conduct any tests to determine what would happen if the Alkar oven were subjected to fire or external heat stresses and does not know whether such testing is reasonable or required. Furthermore, Alkar did not undertake any formal design review process during its development of the Alkar oven. While, Alkar had "quite a few informal design meetings at a lot of stages," no notes or records were taken during those meetings. Advance Brands's Appendix in Support of Resistance ("Advance Brands App'x") (docket nos. 114-3 through 114-7) at 36. Likewise, Alkar did not perform any formal hazard

analysis after the Alkar oven was completed to determine whether it had any hazards that needed to be addressed. Instead, Alkar did a series of informal hazard analyses, or task analyses, during its development of the Alkar oven, but again, no notes or records were taken of those informal task analyses.

"Pressure relief was developed [in the hydraulic and steam industry] because of repeated instances of overpressurization causing serious injuries and Alkar was familiar with this concept and the history of overpressurization when designing and manufacturing the [Alkar oven]." Advance Brands Statement of Facts at ¶ 32; Alkar's Response to Advance Brands's Statement of Facts at ¶ 32. "Alkar understood that overpressurization in a pressure vessel can occur due to human error," and "[p]ressure relief is installed to alleviate the dangers and hazards of overpressurization, regardless of cause, including human error." Advance Brands Statement of Facts at ¶ 33-34; Alkar's Response to Advance Brands's Statement of Facts at ¶ 33-34. "The coils within the [Alkar oven] are pressure vessels," that are "required to have pressure relief," and "Alkar was aware of this fact when designing and manufacturing the [Alkar oven]." Advance Brands Statement of Facts at ¶¶ 28-29; Alkar's Response to Advance Brands's Statement of Facts at ¶¶ 28-29. Alkar maintains that the Alkar oven "did have pressure relief as it was sold with open flanges on both sides that relieved back to the thermal fluid piping system's expansion tank and pressure relief valve at the boiler." Alkar's Response to Advance Brands's Statement of Facts at ¶ 29. Advance Brands asserts that Alkar was required to install pressure relief at the coils inside the Alkar oven to avoid overpressurization. Alkar denies that it was required to install a mechanism for pressure relief in the Alkar oven itself.

### D. Alkar Oven Manual

Alkar provided Advance Brands with a Manual of Operation and Maintenance ("Manual") for the Alkar oven. The Manual spans over 160 pages of Alkar's Appendix, and provides, at various parts of the Manual, the following:

The purpose of this manual is to familiarize the operator with the safe and reliable operation of the Alkar Food Processing Oven.

Operators, sanitation, maintenance, service, and all other personnel *must* be properly trained and familiar with the equipment, its operation, and related procedures. At no time should personnel, who are not properly trained, be involved with the equipment.

. . . .

**WHEN SERVICING THE EQUIPMENT:**

1. **Always lock out electrical panels** – Electrical panels are provided with local power disconnects. When servicing components on the equipment, be sure the electrical panel(s) is turned off and physically locked out to prevent electrical shock or injury caused by moving machinery.

. . . .

8. **Use common sense!** Any condition which appears unsafe should be reported and then corrected. Do not operate the equipment under unsafe conditions.

9. **Always think safety!** Be mindful of individual safety and the safety of others. Never take shortcuts to save time when safety may be jeopardized, and never operate the equipment if you have not been trained in proper procedures.

. . . .

Always lock out utility services prior to performing maintenance work.

. . . .

Note: Stay near the [o]ven and monitor it as the automatic start sequence occurs. Make sure that the steps occur correctly. Immediately stop the start sequence and investigate if you see or hear anything unusual, or if the steps do not occur in the correct order.

Alkar App'x at 292, 298-299, 300, 308, 332, Exh. 16; Alkar's Statement of Facts at ¶ 20;

Advance Brands's Response to Alkar's Statement of Facts at ¶ 20.

### E. Advance Brands's Lockout Policy

In 2004, Advance Brands instituted its Lockout Policy & Procedures, which was in effect at the time of the incident at issue. The "policy covers employees performing servicing and maintenance activities of machines and equipment where the unexpected energizing, start-up or release of stored energy could cause injury." *Id.* at 529, Exh. 28. Advance Brands also implemented "Machine Specific Lockout Procedures" for the Alkar oven which identified the lockout area as the "Attic of Oven Room." *Id.* at 564, Exh. 30. The Alkar oven-specific lockout procedures indicated that there were no stored energy concerns with respect to the Alkar oven, and listed the following lockout procedures:

1.  Notify employees in the area about the Lockout.

2.  Perform a normal shutdown of the equipment.

3.  Electric – Turn disconnect switch to "off" position.
    Disconnect Location **Control panel in the attic**

4.  Paratherm – Turn valves to "close" position
    Disconnect Location **In the attic**

5.  Place your assigned lock(s) on the lockout device(s). Close the lock(s) and remove your key.
    ‣ If more than one person is required to work on equipment, each person must place his/her own assigned lock on the lockout device.
    ‣ If a shift change occurs during a Lockout, the incoming shift adds their locks before the outgoing shift removes their locks.

6.  Return to the equipment being locked out and attempt to start the equipment to ensure all energy sources have been disconnected and equipment will not operate. CAUTION: Return the operating control to the "neutral" or "off" position after this check.
    ‣ If equipment starts after applying this step, recheck steps 1-4, then contact your Supervisor.

7.  The equipment is now locked out. Proceed with

planned activity.

8.    After planned activity is completed and equipment is
      ready to be placed back in service:
      a.    Reinstall all machine guards.
      b.    Clear all tools from the equipment area.
      c.    Notify employees in the work area that
            you are re-energizing equipment.
      d.    Ensure the operating control(s) are in the
            "neutral" or "off" position.
      e.    Remove lock from the Lockout device.
      f.    Turn disconnect handle to the on position
            (use left hand and stand to the right side
            of the disconnect box).
      g.    Equipment is now operational.

*Id.*

In 2002 and 2004 respectively, Advance Brands employees Curtis Utesch and
Charles Boettcher were tested over Advance Brands's lockout policies. *Id.* at 568-69,
Exh. 33. In 2006, Utesch and Boettcher signed a "NO EXCUSES – NO EXCEPTIONS
Team Member Acknowledgment Form" in which they acknowledged that they received
and understood Advance Brands's Lockout Policy, which was updated in October of 2006.
*Id.* at 566-67, Exh. 32.

### F.  The Incident

On the morning of Saturday, September 15, 2007, Utesch was employed as an
Advance Brands's oven operator. While performing maintenance on the Alkar oven,
Utesch discovered a pinhole leak in the Alkar oven. Utesch then radioed Boettcher, who
was responsible for plant maintenance. Neither Utesch nor Boettcher could determine
whether the leak was in zone 2 or 3 of the Alkar oven. At that time, Utesch and Boettcher
placed locks on the touch-screen control panel in the oven room. Boettcher went to the
mezzanine level and locked out the isolation valves to the thermal fluid piping connected
to zones 2 and 3 of the Alkar oven. While in the attic, Boettcher did not lock out the

electrical panel, also referred to as the motor control panel. Utesch knew that Boettcher was going to the attic to perform a lockout, but did not accompany him. Utesch had never been to the attic. Boettcher then returned to the oven room and discovered the leak was coming from a pipe inside zone 2 of the Alkar oven.

Advance Brands arranged for a welder from Plains Boiler to visit the facility and repair the leak. Boettcher drained thermal fluid from zone 2 of the Alkar oven, but did not drain zone 3 or revisit the attic to open the isolation valves on the piping leading to zone 3. The welder arrived from Plains Boiler that same morning and repaired the leak in approximately twenty minutes. Utesch did not observe the welding, but was present when the welder arrived at the facility. Boettcher then took the welder to another production line to work on a leak in one of the Stein ovens. Boettcher eventually left for the day, leaving all of the locks in place that he and Utesch had set that morning.

On Monday, September 17, 2007, Boettcher arrived at work and removed his lock from the control panel in the oven room. Boettcher did not visit the attic to open the isolation valves that he had closed. Utesch then arrived at work and did not check with Boettcher to see whether he had restored the equipment to normal operation. Utesch proceeded to start the Alkar oven, and observed that it was not reaching the proper temperature in zones 2 and 3. Utesch then radioed Boettcher, who came to the oven room. Boettcher remembered that he did not open the isolation valves, informed Utesch of that fact, and went to the attic level. Boettcher did not instruct Utesch to shut the oven down, and Utesch did not press the emergency stop button or otherwise shut the oven off. Boettcher proceeded to unlock and open the isolation valves on the thermal fluid piping system connected to zone 2. However, Boettcher left the isolation valves on the piping connected to zone 3 in a shut and locked position.

Boettcher then returned to the oven room, and Utesch told him that the zone 2 temperature was rising, but the zone 3 temperature was not. Boettcher remembered that

the isolation valves to zone 3 remained locked, so he proceeded to the mezzanine level to remove the locks. Utesch cannot remember if Boettcher told him the isolation valves to zone 3 were locked, but Utesch did not shut down the oven. Utesch walked away from the oven to work on the fryer, which was approximately 15 to 30 feet away. Boettcher opened the isolation valves on the piping leading to zone 3 and returned to the oven room, where he observed gallons of thermal fluid on the floor.

Utesch testified that at "about the same time" as Boettcher returned to the oven room, Utesch returned to the oven control panel and observed the thermal fluid on the floor. Advance Brands App'x at 139. Utesch testified that there was a cloud, or a fog, that made it hard to see Boettcher. Boettcher yelled for Utesch to "shut it down," so Utesch turned the oven off. *Id.* Boettcher's supervisor instructed him to shut the isolation valves. Boettcher returned to the attic to shut the isolation valves to zone 3. Utesch then walked to the backside of the oven, where he observed fire on the floor of the oven room. Utesch's supervisor, Wes Giebelman, walked into the oven room to see what was going on. When Giebelman observed the fluid, he turned around to leave. Utesch testified there was "like a poof, and it kind of pushed me back." *Id.* Utesch then yelled at everyone to "get out" because there was a fire. *Id.* The explosion knocked Giebelman against the wall, and other Advance Brands employees helped him exit the building.

Boettcher had almost finished closing the isolation valves to zone 3 at the time of the explosion. The explosion seemed like a "whoof, as if lighting a gas grill with a little more propane than you needed[.]" Alkar App'x at 565, Exh. 31. The explosion lifted the ceiling of the oven room, or the floor of the attic where Boettcher was standing, approximately 3 or 4 inches. Boettcher finished closing the isolation valve to zone 3 and radioed his supervisor, who told him to leave and to be careful. Boettcher returned to the oven room and yelled to see if anyone was there. When he did not hear anyone respond, and observed that the room was filled with thick black smoke, he exited the building.

### G. Post-Incident Investigations

On the day of the incident, Advance Brands prepared an incident report detailing the events that took place. Thereafter, Fire Marshall David Schipper of the Iowa State Fire Marshall Division investigated the incident. Schipper prepared a Field Investigation/Disposal Report, in which he stated the following:

> The cause of this fire has been ruled Accidental. No intentional sources for this fire could be determined. The area of origin for this fire was determined to be in the main oven room in Zone #3 of the multi-zone oven. The most probable cause for this fire was thermal oil that leaked into Zone #3 of the oven and was ignited. This leak occurred in a flex corner piece of pipe that the oil ran through in Zone #3 of the oven. An explosion occurred due to this oil being ignited and there was visible structure damage to the walls and ceiling in the oven room. The fire was contained to the inside of the oven and the venting duct work of the oven. Smoke did fill the oven room; however, some smoke did seep to other areas in the plant. It was the understanding of this reporting agent that work on the oven had taken place recently and that the oil supply had been shut-off to the oven during this work. The oil was turned back on just prior to this fire and the oven was being heated up for use. This case shall be closed at this time.

Alkar App'x at 694, Exh. 40.

Schipper later testified that he determined that the ignition source was the heat from the Alkar oven. Schipper further testified that he could not recall seeing anything outside the oven that he considered to be a potential origination source for the fire. During his deposition, counsel asked Schipper, "Did you come to a conclusion as part of your investigation that the inside of Zone 3 was the source of the fire?" Advance Brands App'x at 239. Schipper responded affirmatively. *Id.* Counsel then asked, "And, can you state that with a reasonable degree of certainty as a deputy [F]ire [M]arshall." *Id.* Schipper responded, "Yes." *Id.*

In addition to Schipper's investigation, some of the parties in this action hired

experts who drafted their own reports regarding the incident. Advance Brands's engineering expert, Bartley J. Eckhardt, maintains that the bellows in zone 3 of the Alkar oven ruptured so quickly after Utesch started the Alkar oven that "no one, including Boettcher, could have reached the isolation valves in time to have averted the rupturing of the bellows." Alkar App'x at 783, Exh. 45.

## H. Damages

On September 18, 2007, Alkar told Advance Brands the Alkar oven was repairable, and provided Advance Brands with a list of repairs. Advance Brands believed the Alkar oven was "damaged beyond repair and replacement was a more prudent course of action." Advance Brands's Response to Alkar's Statement of Facts at ¶ 102. Advance Brands asserts that it is entitled to money damages because, among other things, it sustained damages to its facility, lost inventory and had to replace the oven.

## VII. ANALYSIS

### A. Applicable State Law

Advance Brands maintains that Wisconsin law should govern this dispute. Alkar argues that Iowa law should control because Advance Brands has failed to demonstrate that a conflict exists between Iowa law and Wisconsin law. *See Phillips v. Marist Soc. of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) ("'[B]efore entagling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states'" (quoting *Barron v. Ford Motor Co. of Can., Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992))). However, Alkar acknowledges in its Reply that the laws of the two states conflict on products liability. *See* Reply at 10. Accordingly, the court must resolve the conflict of laws issue.

"In a diversity action such as this, in order to determine what state's law applies to [Advance Brands's] claims, the court must use the choice-of-law rules of the forum state, in this case, Iowa." *Johnson v. Am. Leather Specialties Corp.*, 578 F. Supp. 2d 1154,

1165 (N.D. Iowa 2008).  Iowa courts "'follow the Restatement (Second) of Conflict of Laws's most significant relationship methodology for choice of law issues.'"  *Johnson*, 578 F. Supp. 2d at 1165 (internal marks omitted) (quoting *Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897 (Iowa 1996)).  The proper inquiry varies depending upon whether the claim arises in contract or tort.  *See id.* at 1165 n.5.

In a tort case, such as this one, the court applies the most significant relationship test set forth in Restatement (Second) of Conflict of Laws § 145 (1971).  *See id.* at 1165. Section 145 provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the injury occurred,
>> (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and
>> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 6 of the Second Restatement states:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
>> (a) the needs of the interstate and international systems,
>> (b) the relevant policies of the forum,
>> (c) the relevant policies of other interested sates and the

relative interests of those states in the determination of
the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of
law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law
to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

### 1. *Section 145(2) contacts*

#### i. *The place where the injury occurred*

It is undisputed that the fire and explosion occurred in Iowa, and that the resulting damages were sustained in Iowa. Advance Brands maintains that the place of injury is unimportant in products liability cases, and cites *Linden v. CNH Am. LLC*, ___ F. Supp. 2d. ___, No. 3:09-cv-00019-JEG, 2010 WL 4840427, at *3 (S. D. Iowa Jan. 26, 2010). However, *Linden* merely states that "[t]he place of injury is of little importance when the state wherein the injury occurred *has no other interest in the case*." *Id.* (emphasis added); *see also Johnson*, 578 F. Supp. 2d at 1166-67. As discussed below, Iowa has other interests in this case, and the court finds that, under the facts presented here, the place where the injury occurred is relevant. Consequently, in determining which state has the most significant relationship to the occurrence and the parties, the court will give weight to the fact that the injury occurred in Iowa.

#### ii. *The place where the conduct causing the injury occurred*

"Courts have recognized in products liability cases that the place where the allegedly defective product was designed, marketed, or manufactured is 'the place where the conduct causing the injury occurred' and have given significant weight to that factor in the conflict-of-laws calculus." *Id.* at 1167 (quoting Restatement (Second) of Conflict of Laws § 145). In fact, the place where the product was designed, manufactured and marketed is often given relatively greater weight than the place of injury in products

22

liability cases. *See id.* In this case, Alkar designed, manufactured and marketed the Alkar oven in Wisconsin. Thus, in the usual products liability case, this factor would weigh heavily in favor of the court's application of Wisconsin law.

However, the place where the product was designed, manufactured and marketed is not necessarily entitled to greater weight where there is evidence that conduct occurred in the place of injury that substantially contributed to the injury. *See id.* As part of its negligence claim, Advance Brands maintains that Alkar's failure to properly install the Alkar oven in Iowa contributed to the injury. Furthermore, there is evidence in the record that Advance Brands, Gleeson and Plains Boiler engaged in conduct at Advance Brands's Orange City facility that may have contributed to the injury. Taking into consideration all of the evidence in the record, and considering all of the facts in the light most favorable to Advance Brands, the court concludes that this factor is neutral and does not favor the court's application of either Iowa or Wisconsin law.

### iii. *The place of incorporation and place of business of the parties*

The third factor the court must consider is the parties' domicile, residence, nationality, place of incorporation and place of business. Generally, "a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place." Restatement (Second) of Conflict of Laws § 145 cmt. e. The Restatement Comments further provide "that the weight accorded to domicile, residence, place of incorporation, and place of business depends upon the extent to which they are 'grouped' with other contacts." *Linden*, 2010 WL 4840427, at *4 (quoting Restatement (Second) of Conflict of Laws § 145 cmt. e).

Construing the facts in the light most favorable to the non-moving party, Advance Brands is a Delaware corporation with its principal place of business in Edmond, Oklahoma. Neither Alkar nor Advance Brands maintain that either of these states have an

interest in the action, and no other factor favors the use of either Delaware or Oklahoma law. Alkar is a Wisconsin corporation with its principal place of business in Lodi, Wisconsin. Additionally, Alkar designed, manufactured and marketed the Alkar oven in Wisconsin. The grouping of these two factors favors the application of Wisconsin law.

Advance Brands maintains that Gleeson and Plains Boiler's place of incorporation and principal place of business are irrelevant, but cites no support for its claim. The court disagrees. Gleeson and Plains Boiler are parties to this action and the court will consider them in its choice of law analysis. *See, e.g., Daniel Hamm Drayage Co. v. Waldinger Corp.*, 508 F. Supp. 390, 395 (E.D. Mo. 1981) *affirmed in part, modified in part by* 666 F.2d 1213 (8th Cir. 1982) (considering third-party defendants); *see also Miller v. Long-Airdox-Co.*, 914 F.2d 976, 978-81 (7th Cir. 1990) (same); *Estate of Pigorsch ex rel. Martin v. York College*, 734 F. Supp. 2d 704, 713-18 (N.D. Iowa 2010) (same). Gleeson is an Iowa limited liability corporation with its principal place of business in Sioux City, Iowa. Plains Boiler is an Iowa corporation with its principal place of business in Sioux City, Iowa.

In light of the fact that Alkar's place of incorporation and principal place of business are in Wisconsin, and the fact that Gleeson and Plains Boiler's places of incorporation and principal places of business are in Iowa, the court concludes that this factor is neutral.

### iv. *The place where the relationship between the parties is centered*

The final factor under Section 145(2) is "the place where the relationship, if any, between the parties is centered." Restatement (Second) Conflict of Laws § 145(2)(d). The court concludes that the relationship between the parties is centered in Iowa for the following reasons:

Advance Brands purchased the Alkar oven when it expanded its Orange City facility in 2005. Advance Brands faxed a purchase order for the Alkar oven from its Orange City facility to MP Equipment Company in Suwanee, Georgia. Alkar designed and

manufactured the Alkar oven in Wisconsin according to specifications Advance Brands's Orange City facility provided. Advance Brands maintains that "Alkar custom-made the [Alkar] oven to integrate into [its] existing system." Advance Brands's Statement of Facts at ¶ 14.

Advance Brands entered into a contract with Gleeson in Iowa, providing for Gleeson to serve as the general contractor on the 2005 expansion. Gleeson then entered into a Subcontract Agreement with Plains Boiler in Iowa. Gleeson designed the expansion of the thermal oil system that was piped to the Alkar oven in Iowa, and Plains Boiler installed the thermal piping system in Iowa. Furthermore, Advance Brands maintains that "[t]he design of the thermal fluid piping system was a collaborative effort that included Alkar." Advance Brands's Response to Alkar's Statement of Facts at ¶¶ 13, 27, 36.

After Alkar completed the design and manufacture of the Alkar oven, Alkar sent it to Advance Brands's Orange City facility, where Alkar assembled and installed it. Alkar employees took multiple trips to the Orange City facility and spent three or four days there training Advance Brands's employees regarding how to operate, maintain and clean the Alkar oven. The court therefore concludes that the relationship between Advance Brands and Alkar, as well as their relationships with Gleeson and Plains Boiler, are centered in Iowa.

### v.    *Summary*

In sum, two of the Section 145(2) factors—the place where the conduct causing the injury occurred and the parties' place of incorporation and place of business—are neutral. The remaining two factors—the place where the injury occurred and the place where the relationship between the parties is centered—favor the application of Iowa law. Thus, the court concludes that between Iowa and Wisconsin, Iowa has the dominant interest in this action.

**2. Section 6 factors**

In determining the applicable state law, the court must also consider the principles stated in Restatement (Second) of Conflict of Laws § 6. *See, e.g., Jones ex rel. Jones v. Winnebago Indus., Inc.*, 460 F. Supp. 2d 953, 972 (N.D. Iowa 2006). The Section 6 factors vary somewhat in importance from field to field. *See Johnson*, 578 F. Supp. 2d at 1169 (citing Restatement (Second) of Conflict of Laws § 145 cmt. b). In a tort action, the factors that are entitled to greater weight are (1) "the needs of the interstate and international systems"; (2) "the relevant policies of the forum"; (3) "the relevant policies of other interested states and particularly of the state with the dominant interest in the determination of the particular issue"; and (4) "ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 145 cmt. b; *see also Johnson*, 578 F. Supp. 2d at 1169 (discussing Section 6 factors).

**i. The needs of the interstate and international systems**

"Respect for interstate and international systems is maintained when the forum state, when choosing to apply its own law, has a 'substantial connection' with the issue." *Veasley*, 553 N.W.2d at 899 (quoting *Milkovich v. Saari*, 203 N.W.2d 408, 417 (Minn. 1973)). Pursuant to the court's analysis of the Section 145(2) contacts, Iowa is the state with the dominant interest in this case. Iowa has a sufficient substantive connection with the products liability and other tort issues involved in this case that respect for interstate and international systems will be maintained if the court applies Iowa law. *See Johnson*, 578 F. Supp. 2d at 1170. "Moreover, Iowa's products liability, comparative fault, and damages laws are 'not so abnormal that an application of Iowa law would greatly disrupt interstate order' in this case[.]" *Id.* (quoting *Veasley*, 553 N.W.2d at 899). This factor therefore favors the application of Iowa law

**ii. The relevant policies of the forum and other interested states**

The next two factors for the court to consider are the relevant policies of the forum

26

state and the relevant policies of other interested states. Restatement (Second) Conflicts of Law § 6(2)(b) and (c). In considering the latter factor, it is particularly important to consider the relevant policies of the state with the dominant interest in the case. *See id.* § 145 cmt. b. In this case, Iowa is both the forum state and the state with the dominant interest in the case. The general policy underlying Iowa tort law is to fully compensate tort victims for their loss. *See Johnson*, 578 F. Supp. 2d at 1170 (citing *State v. Ihde*, 532 N.W.2d 827, 829 (Iowa Ct. App. 1995)). Advance Brands concedes that Wisconsin's tort law serves the same purposes. *See* Advance Brands Br. at 9 (citing *Thomas C. v. Physicians Ins. Co. of Wis.*, 509 N.W.2d 81, 83 n.2 (Wis. Ct. App. 1993)). Because Iowa has the dominant interest in this case, and Advance Brands has failed to demonstrate that another interested state has a greater policy interest, these two factors weigh in favor of the application of Iowa law.

### iii.    *Ease of determination and application of the law*

The court finds no significant impediment to its ability to determine and apply either Iowa or Wisconsin law in this case. Consequently, this factor is of little importance where, as here, no complex substantive laws are involved. *See, e.g., Johnson*, 578 F. Supp. 2d at 1171; *Veasley*, 553 N.W.2d at 898.

### iv.    *Other Section 6 factors*

The remaining Section 6 factors are less important in this tort case. These factors are (1) "the protection of justified expectations"; (2) "the basic policies underlying the particular field of law"; and (3) "certainty, predictability and uniformity of result[.]" Restatement (Second) of Conflict of Laws at § 6(2)(d)-(f). Having considered each of these factors, the court concludes that none of these factors weigh against the application of Iowa law in this case.

## B. Advance Brands's Products Liability Claims

### 1. Manufacturing defect claim

Advance Brands alleges that a manufacturing defect in the Alkar oven caused the fire and explosion. Alkar maintains that it is entitled to summary judgment on Advance Brands's manufacturing defect claim because Advance Brands "never identified any deviation from the product's design or any mistake in the manufacturing process." Alkar Br. at 14.

In *Wright v. Brooke Group, Ltd. (Wright II)*, 652 N.W.2d 159, 169 (Iowa 2002), the Iowa Supreme Court adopted the Restatement (Third) of Torts: Products Liability Sections 1 and 2 (1998) ("Products Restatement") in product defect cases. The Products Restatement provides that "[a] product is defective when, at the time of sale or distribution, it contains a manufacturing defect[.]" Restatement (Third) of Torts: Products Liability § 2. "A product . . . contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product[.]" *Id.* § 2(a). Stated another way, "a manufacturing defect is a departure from a product unit's design specifications." *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092, 1095 (8th Cir. 2007) (internal marks omitted) (applying Iowa law) (quoting Restatement (Third) of Torts: Products Liability § 2 cmt. c); *see also Parish v. Icon Health & Fitness, Inc.*, 719 N.W.2d 540, 55 (Iowa 2006) (noting that the Iowa Supreme Court also adopted the Products Restatement's commentary).

In *Depositors Insurance*, the Eighth Circuit Court of Appeals considered an Iowa manufacturing defect claim brought by a homeowner and her insurance company against Wal-Mart. *Depositors Insurance*, 506 F.3d at 1094. The Eighth Circuit Court of Appeals affirmed the district court's grant of summary judgment on the manufacturing defect claim because "the plaintiffs never offered any evidence showing (1) the intended design of [the product] or (2) how the manufacturing of [the product] departed from the intended product

designs." *Id.* at 1095. The Eighth Circuit Court of Appeals explained that "[a] departure from the intended design of a product cannot be determined without knowing the actual intended design of the product." *Id.* "Thus, under Iowa law, an essential element of any manufacturing defect claim is the intended design of the product." *Id.* (citing *Wright II*, 652 N.W.2d at 178-179).

In its Resistance, Advance Brands did not respond to Alkar's assertion that it is entitled to summary judgment due to Advance Brands's failure to identify how the Alkar oven deviated from its intended design. Advance Brands has not provided the court with any evidence regarding Alkar's intended design of the Alkar oven, or how the Alkar oven deviated from its intended design.[2] Because Advance Brands has failed to support its manufacturing defect claim, the court shall grant summary judgment on this issue. *See id.*; *see also Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004) (noting that the district court is not obligated to search the entire record for specific facts that might support the non-moving party's claim).

### 2. Design defect claim

Advance Brands alleges that the defective design of the Alkar oven caused the fire and explosion at its Orange City facility. In the Motion, Alkar argues that it is entitled to summary judgment on this claim for three reasons: (1) "the alleged defect that forms the basis for [Advance Brands's] claims is not part of Alkar's product"; (2) "the fire was

---

[2] The court recognizes that in its Statement of Additional Facts, Advance Brands did state that "[t]he [Alkar oven] was designed with the intent to allow the customer to run the zones at different temperatures, if the customer wanted to stop a zone for whatever reason." Advance Brands's Statement of Facts at ¶ 27. To support this assertion, Advance Brands relies upon Mikelsons's testimony that, while the Alkar oven was generally designed so that it could be operated at slightly different temperatures, it was not designed to run with one zone off. Advance Brands does not offer this fact to support its manufacturing defect claim, nor has it provided any evidence that the separate zones of the Alkar oven were not operational at slightly different temperatures.

caused by [Advance Brands's] own failure to follow its own safety procedures, failure to adhere to industry operation standards, and misuse of the equipment in its facility"; and (3) "[Advance Brands] has not met its burden of establishing a reasonable alternative design." Alkar Br. at 14.

### i.   Whether alleged defect was part of the Alkar oven

Alkar maintains that Advance Brands's design defect claim fails because it is based upon the over-pressurization of trapped thermal fluid and the Alkar oven does not trap thermal fluid. Alkar maintains that Advance Brands trapped the thermal fluid when it closed the isolation valves Gleeson and Plains Boiler installed on the thermal fluid piping system external to the Alkar oven.

In its Resistance, Advance Brands explains,

> The defect in the [Alkar oven] is not that thermal fluid became trapped in the oven. Rather, the [Alkar oven] is defective because the [Alkar oven] itself heated the thermal fluid, caused it to expand, overpressurized the internal bellows, which burst and sprayed hot thermal fluid which the [Alkar oven] then ignited, causing the [Alkar oven] to explode.

Advance Brands Br. at 10. To support its position, Advance Brands cites Bartley Eckhardt's Engineer's Report and corresponding deposition testimony. Advance Brands hired Eckhardt to serve as its engineering expert in this case. Eckhardt's findings include the following:

> Within the bounds of reasonable engineering certainty, and subject to change if additional information becomes available, it is my opinion that:
>
> 7.1   Alkar's failure to conduct a proper hazard analysis with respect to the thermal fluid piping system within its product violated well known standards of care in the industry and was a cause of this catastrophic incident.
>
> 7.2   Alkar's failure to conduct a proper hazard analysis caused the incident oven to leave Alkar's control in a

defective condition which was a cause of this catastrophic incident.

*Alkar's design reviews failed to address critical safety aspects, including, but not limited to, overpressurization and shut down hazards. Alkar's design review was deficient and therefore improper. Had Alkar conducted a proper design review, the need for pressure relief would have been apparent, would have been addressed and this incident would have been prevented.*

*Alkar's failure to provide an oven that was reasonably safe and complied with NFPA 86 was a defect and a cause of the incident fire and explosion.*[3]

7.3     Advance Brands did not act unreasonably in installing isolation valves to and from each zone as required by the NFPA.

7.4     Alkar knew, or should have known, of the ability to trap thermal fluid in a zone if the isolation valves were closed.

7.5     Alkar knew or should have known, that leaks in the thermal fluid system such as occurred in this incident could occur.

7.6     Alkar's failure to provide stop flow detection was neither state-of-the-art nor state-of-the-industry, was a defect, and was a cause of this catastrophic incident.

7.7     Alkar's failure to design against over pressurization was a defect and was a cause of this catastrophic incident.

7.8     Alkar's failure to design against leaks was a defect and was a cause of this catastrophic incident.

7.9     Had Alkar provided over-pressure relief protection this catastrophic incident would have been prevented.

---

[3] The italicized material represents content Eckhardt added to his supplemental Engineer's Report.

7.10   Alkar's failure to provide over-pressure relief protection was contrary to industry requirements and was a defect, and denied Advance Brands protection to which they were entitled and was a cause of this catastrophic incident.

7.11   Alkar's failure to provide leak detection was neither state-of-the-art nor state-of-the-industry, was a defect and was a cause of this catastrophic incident.

7.12   The incident Alkar oven was dangerous, defective and unsuited for its intended purpose.

Alkar App'x at 807-809, Exh. 45.

Eckhardt testified that "if the isolation valves are shut and thermal fluid is trapped within a zone of the oven, because there's no pressure relief internal to the oven, . . . each zone can get heated up from an adjacent zone . . . that's on." Advance Brands App'x at 153. Advance Brands also cites the testimony of Fire Marshall Schipper, who testified that the heat from the Alkar oven ignited the thermal fluid, and that the source of the fire was zone 3 of the Alkar oven. The court concludes that Advance Brands has sufficiently alleged that the Alkar oven itself, and not some mechanism external to the Alkar oven, was defective.

### ii.    Whether Advance Brands caused the fire

Alkar maintains that Advance Brands's defective design claim should be dismissed because "the fire was caused by [Advance Brands's] own failure to follow its own safety procedures, failure to adhere to industry operation standards, and misuse of the equipment in its facility." Alkar Br. at 14. Alkar alleges that Advance Brands failed to follow its own Lockout Policy & Procedures and Machine Specific Lockout Procedures at the time of the incident, and maintains that "the very premise of this case represents an attempt by [Advance Brands] to offer excuses for its own product misuse and repeated violations of [its procedures]." *Id.* at 17. Alkar sets forth twelve errors it alleges Advance Brands

made at the time of the incident. Alkar argues, "Where, as here, the undisputed evidence plainly shows that [Advance Brands's] misuse was the cause of the injury, summary judgment in favor of [Alkar] should be granted." *Id.* at 19. Alkar further maintains that Advance Brands's misuse of the Alkar oven was not reasonably foreseeable.

Advance Brands counters by arguing that "[e]very expert and engineer in this case, including Alkar's own expert engineer, Dean Harris, admits that if Alkar installed a proper pressure relief device in its oven, the fire and explosion would not have occurred, regardless of any of the actions of [Advance Brands's] employees." Advance Brands Br. at 14. Advance Brands maintains that the Alkar oven was defective and unreasonably dangerous, and that it was the proximate cause of the incident. Advance Brands further states that, even if the actions of Advance Brands's employees played a role in the explosion, the actions of its employees were reasonably foreseeable, and Alkar should have taken such foreseeable misuse into account in its design of the Alkar oven.

"One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." Restatement (Third) of Torts: Products Liability § 1 (1998). Alkar's argument that it cannot be liable because the accident was caused by the conduct of Advance Brands's employees ignores the well-established law that "[t]here can be more than one proximate cause of an injury or accident." *See, e.g., Am. Fam. Mut. Ins. Co. v. Allied Mut. Ins. Co.*, 562 N.W.2d 159, 166 (Iowa 1997). Further, "[i]f a product's design defect and misuse both contribute to cause an accident, the misuse cannot constitute a supervening cause if the misuse was foreseeable, even if the act alleged to be a supervening cause is the negligence of a third party." 63A Am. Jur. 2d *Products Liability* § 898 (internal footnote omitted); *see also Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 828-31 (Iowa 2000) (discussing intervening causes in products liability case); *cf. Raney v. Honeywell, Inc.*, 540 F.2d 932, 934 (8th Cir. 1976) (applying Iowa law)

(noting that a "product must be designed so that it is reasonably safe for uses that are foreseeably probable, whether or not those uses were intended by the manufacturer").

The court concludes that Advance Brands has supported its claim with sufficient evidence that the Alkar oven was defective and caused its damages. The court need not recount all of that evidence here. However, as discussed above, Advance Brands's engineering expert detailed that, in his opinion, the Alkar oven was defective and was a cause of the fire and resulting explosion. Among other reasons, Eckhardt asserts that the Alkar oven was defective because Alkar failed to install a mechanism to prevent overpressurization, and that such failure was a cause of the incident. Based upon this evidence and the other evidence Advance Brands submitted in opposition to the Motion, the court concludes that Advance Brands has demonstrated genuine issues of material fact regarding whether the Alkar oven was a proximate cause of its damages.

Furthermore, Advance Brands sets forth sufficient evidence to support its position that the actions of its employees, namely running the Alkar oven with one zone closed off at the isolation valves, was reasonably foreseeable. Two Alkar engineers, including Mikelsons, the project engineer on the Alkar oven, testified that it is customary to install isolation valves on the thermal piping system's supply and return lines connecting to the Alkar oven in order to perform maintenance. Mikelsons admitted that the isolation valves often needed to be closed to perform such maintenance, and Mikelsons also testified that it is common to perform maintenance on the Alkar oven while the oven is running and is otherwise unsafe for normal operation. Additionally, Advance Brands's human factors expert prepared a report in which he concluded, among other things, that "the actions of Advance Brands'[s] employees, Utesch and Boettcher, were reasonable and foreseeable to Alkar." Alkar App'x at 900, Exh. 46. Based upon this and other evidence in the record, the court concludes that genuine issues of material fact exist regarding whether Advance Brands's use of the Alkar oven at the time of the incident was reasonably

foreseeable.

### iii. Whether Advance Brands established a reasonable alternative design

### a. Products Restatement on defective design

The Products Restatement provides:

> A product is defective when, at the time of sale or distribution, it . . . is defective in design[.]  A product:
>
> . . . .
>
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe[.]

Restatement (Third) of Torts: Products Liability § 2(b).

Thus, in order to support a defective design claim, a plaintiff must demonstrate that the harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design.  *See id.*  If the court concludes that the plaintiff has presented sufficient evidence "so that reasonable persons could conclude that a reasonable alternative could have been practically adopted," the issue becomes one for the trier of fact.  *See id.* § 2 cmt. f.  The Products Restatement does not require a plaintiff to "produce a prototype in order to make out a prima facie case."  *Id.*  Instead, "qualified expert testimony on the issue suffices . . . if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale."  *Id.*

### b. Parties' arguments

Alkar argues that Advance Brands has failed to establish a reasonable alternative design because (1) the proposed alternative design does not correct any problem with the oven, but instead focuses on the thermal piping system; (2) "Eckhardt has zero knowledge or experience of the oven industry," Alkar Br. at 21; and (3) Eckhardt's proposed

alternative design is speculative, unreasonable and relies upon components that do not exist.

Advance Brands maintains that Eckhardt, a mechanical engineering expert, "is well-versed in the manufacturing and production of mechanical systems, specifically thermal fluid systems, and has designed and developed 'thousands of thermal fluid systems' for the food industry." Advance Brands Br. at 20 (quoting Eckhardt's deposition testimony, Advance Brands App'x at 146). Advance Brands argues that Eckhardt did, in fact, establish two reasonable alternative designs that would require changes to the Alkar oven itself. Additionally, Advance Brands states that Eckhardt's alternative designs are reasonable and do not rely upon components that do not exist.[4]

### c.    *First alternative design*

At the outset, the court disregards Alkar's argument that "Eckhardt has zero knowledge or experience of the oven industry." Alkar Br. at 21. Alkar does not allege that Eckhardt is unqualified to serve as an expert witness under Federal Rule of Evidence 702, nor does Alkar challenge the reliability of Eckhardt's expert testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993). "[A]n expert does not need to be a specialist in the area of testimony as long as the testimony is within the general area of expertise of the witness." *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 687 (Iowa 2010). Advance Brands has established, for purposes of the Motion, that Eckhardt has a

---

[4] To counter Alkar's position that the components Eckhardt relied upon do not exist, Eckhardt drafted an affidavit ("Eckhardt Affidavit") in which he explained that the component parts do exist and where they can be located. *See* Advance Brands App'x at 277-279. Advance Brands submitted the Eckhardt Affidavit in support of its Resistance. In its Reply, Alkar states that the Eckhardt Affidavit should be stricken because it was submitted after the close of discovery. Alkar does not provide any support for its position. To the extent Alkar moves to strike the Eckhardt Affidavit in its Reply, the court declines to do so. *See* LR 7(e) (noting that a motion should not be filed in a response but "must be filed separately as a new motion").

significant amount of experience working with thermal fluid systems, *see* Advance Brands App'x at 146, and the court will consider his Engineer's Report, supplemental reports and corresponding testimony in deciding the Motion.

In his Engineer's Report, Eckhardt explains,

> I have prepared a safe alternative design that calls for a 3-way valve at the inlet and a 3-way valve at the outlet to and from each zone respectively. . . . Flow can be isolated in each zone without any risk of trapping thermal fluid. Stop flow detection and leak detection is accounted for in my safe alternative design.
>
> . . . .
>
> My alternative design has the stop flow detection tied to the PLC [, or touch-screen control panel]. The stop flow signal is fed back to the PLC to verify that the flow condition is consistent with what the PLC is calling for. So any condition where flow stoppage is appropriate, would not get picked up as an alarm or shutdown.
>
> Backflow prevention is also accounted for in my alternative design.
>
> The cost associated with providing overpressure protection, 3-way divert on supply and return, and back flow prevention is approximately $6,000 per zone.

Alkar App'x at 800, Exh. 45. Eckhardt also included in the Engineer's Report a chart and illustration detailing his proposed alternative design. *See id.* at 734-734. Advance Brands explains that Eckhardt's alternative design places "pressure relief devices, including a rupture disk, directly within the [Alkar oven] itself, which would have prevented this incident." Advance Brands Br. at 20. Upon reviewing the Engineer's Report and proposed alternative design, the court concludes, for purposes of the Motion, that Eckhardt's proposed alternative design suggests changes to the Alkar oven and related items Alkar installed at the Advance Brands's facility.

Alkar contends that Eckhardt's proposed alternative design is speculative and

unreasonable and that two of the components Eckhardt uses in his alternative design, a 3-way valve and a flow meter, do not exist for use with the high temperatures in the thermal fluid system. Advance Brands argues that "[t]he components in Eckhardt's alternative design exist and existed at the time Alkar designed and manufactured the oven, are readily available from multiple manufacturers and are economically feasible." *Id.* To support this assertion, Advance Brands cites the Eckhardt Affidavit, in which Eckhardt counters Alkar's claims by providing specific examples of such components, along with information about where they can be purchased.

Based upon the Eckhardt Affidavit, Eckhardt's Engineer's Report and corresponding testimony, the court concludes that Advance Brands has presented sufficient support for its proposed alternative design to survive summary judgment. Consequently, the court need not address the remaining issues Advance Brands raises to support its position. Specifically, the court declines to address whether the Alkar oven's design was manifestly unreasonable, exempting Advance Brands from the reasonable alternative design requirement.

### d. Second alternative design

The second alternative design Advance Brands refers to was actually proposed by Gleeson's expert, John Holecek. In fact, Gleeson, Advance Brands and Alkar each hired experts that presented their own alternative designs. Alkar's expert, Harris, proposed that Gleeson and Plains Boiler could have installed thermal hydrostatic pressure relief around the isolation valves. Gleeson's expert, Holecek, determined that "the sequence of events that led to the subject fire was not a sequence that would be reasonably foreseeable." Alkar App'x at 1065, Exh. 53. Even though he did not think an alternative design was necessary, Holecek proposed what he believes is a simpler and more practical reasonable alternative design than the ones Eckhardt and Harris proposed. Specifically, Holecek explained that Alkar could have programmed the Alkar oven's PLC "to shut down the flow

of oil to all the zones in the event that an abnormal heating situation was noted." *Id.* at 1067. Eckhardt later drafted a Rebuttal Report, in which he stated:

> Defendant Gleeson's expert, John Holecek, opines that Alkar could have provided a shutdown feature in their PLC triggered by the existing zone temperature alarm.
>
> Holecek's solution was technically and economically feasible, would have prevented this incident and could and should have been done by Alkar. It is my opinion that this solution would not have obviated the need and requirement for a pressure relief device for the thermal fluid at each zone.

*Id.* at 1113.

Advance Brands asserts that "[t]his second alternative design would include simple computer programming of the Alkar oven while utilizing the features already contained within the oven itself." Advance Brands Br. at 21. Alkar contests the second proposed design because Eckhardt is not an expert in software, he did not examine the Alkar oven's touch-screen control panel and he did not know what kind of software it ran. Alkar also argues that the second alternative design fails to address a problem in the Alkar oven. Because Advance Brands was only required to present evidence of one alternative design, the court need not consider the reasonableness of the second proposed alternative design.

### 3. *Failure to warn claim*

Alkar maintains that the court should dismiss Advance Brands's failure to warn claim for three reasons. First, Alkar asserts that it did not have a duty to warn Advance Brands about an overpressurization condition that did not exist in the Alkar oven itself. Second, Alkar argues that Advance Brands did not read the warnings that Alkar provided, Advance Brands did not present any evidence that it would have read other warnings and the Complaint fails to allege that Alkar's warnings were inadequate in presentation or location. Third, Alkar alleges that Advance Brands failed to demonstrate Alkar knew or had reason to know that the product was dangerous.

39

Advance Brands maintains that Alkar had a duty to warn because the Alkar oven "is defective and dangerous and Alkar should have foreseen this incident." Advance Brands Br. at 22. Advance Brands argues that some of its employees did read the manual, and further asserts that Alkar did not expect Advance Brands's employees to read the Manual. Finally, Advance Brands argues that, to the extent Alkar did provide warnings, such warnings were insufficient in presentation and location.

Iowa courts have held that failure to warn claims are properly examined under a theory of negligence. *See Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 289-290 (Iowa 1994). "In determining whether a manufacturer owes a duty to warn, Iowa courts apply the principles of the Restatement (Second) of Torts § 388." *Wright v. Brooke Group Ltd. (Wright I)*, 114 F. Supp. 2d 797, 818 (N.D. Iowa 2000). Section 388 provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

"In testing the defendants' liability for negligence in failing to warn, the defendants should be held to the standard of care of an expert in its field." *Wright I*, 114 F. Supp. 2d at 819. "The relevant inquiry therefore is whether the reasonable manufacturer knew or should have known of the danger, in light of the generally recognized and prevailing

best scientific knowledge, yet failed to provide adequate warning to users or consumers." *Olson*, 522 N.W.2d at 290. "To prevail on a claim against a manufacturer for negligent failure to warn, unless the danger is open and obvious, a plaintiff must establish (1) the manufacturer knew or should have known of the danger, (2) any warnings given were inadequate, and (3) an adequate warning would have altered the plaintiff's conduct and avoided the injury." *Johnson v. Harley Davidson Motor Co. Group, Inc.*, 680 N.W.2d 378, No. 03-044, 2004 WL 370251, at *4, (Iowa Ct. App. Feb. 27, 2004) (Table).

As discussed above, the court already concluded that Advance Brands raised genuine issues of material fact as to whether the Alkar oven itself was defective and dangerous, and whether Alkar knew or had reason to know of the danger. Consequently, the court rejects Alkar's argument that it had no duty to warn of a defect that did not exist in the Alkar oven itself, as well as the argument that Advance Brands failed to demonstrate Alkar knew or had reason to know that the product was dangerous.

Next, the court considers Alkar's argument that Advance Brands's "failure to warn claim fails as a matter of law because: (a) [Advance Brands] did not read the warnings that Alkar provided; (b) there is absolutely no evidence that [Advance Brands] would read other warnings; and (c) [Advance Brands's] Complaint does not allege that the Alkar warnings were inadequate in presentation or location." Alkar Br. at 22. The only warnings Alkar maintains it provided were in the Manual. Boettcher testified that he studied the Manual, passed a test on the Alkar oven and attended portions of the training Alkar provided on the Alkar oven and Manual. Boettcher also testified that his supervisor attended all of Alkar's training sessions. This testimony is sufficient to create genuine issues of material fact as to whether Advance Brands read the warnings Alkar provided and whether Advance Brands would have read other warnings.

Similarly, the court finds there are genuine issues of material fact regarding whether Alkar's warnings were adequate. In its Resistance, Advance Brand argues that "Alkar's

warnings were patently inadequate in content, presentation and location." Advance Brands Br. at 24. Alkar maintains that Advance Brands is attempting to use its Resistance to amend the Complaint by asserting a new theory, namely that the warnings were inadequate. The court disagrees.

Pursuant to Federal Rule of Civil Procedure 8(a)(2), a pleading must only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Advance Brands made clear that it was pursuing a failure to warn claim in its Complaint. Furthermore, "in some circumstances, a party may obtain relief on a theory of recovery not expressly pleaded in the complaint but proved at trial, when it is based on the same wrongful act that was pleaded, and when the opposing party has had fair notice." *Morgan Distrib. Co., Inc. v. Unidyamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989). The court concludes that Alkar had fair notice of Advance Brands's various theories of liability and Alkar will not be prejudiced by the court's consideration of this issue. *See id.* at 994-995. The court therefore declines to grant summary judgment on Advance Brands's failure to warn claim.

### C. Advance Brands's Implied Warranty Claims

#### 1. Warranty of merchantability

Iowa law provides for an implied warranty of merchantability. *See* Iowa Code § 554.2314(1) ("Unless excluded or modified . . ., a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.").

> In order to establish a breach of that warranty, [a plaintiff is] required to prove the following: (1) a merchant sold the goods; (2) the goods were not 'merchantable' at the time of the sale; (3) injury or damage occurred to their person or property; (4) the defective nature of the goods caused the damage 'proximately and in fact'; and (5) notice of the injury was given to the seller.

*Hilsman v. Phillips*, 764 N.W.2d 784, No. 08-0298, 2009 WL 249885, at *4 (Iowa Ct. App. Feb. 4, 2009) (Table) (quoting *Van Wyk v. Norden Labs., Inc.*, 345 N.W.2d 81, 87 (Iowa 1984)). "Goods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used[.]" Iowa Code § 554.2314(2)(c).

In the Complaint, Advance Brands maintains that Alkar designed and manufactured the Alkar oven specifically for Advance Brands and "knew of [Advance Brands's] intended use and intended purpose of the Alkar oven." Complaint at ¶ 35. Advance Brands asserts that Alkar owed Advance Brands an implied warranty of merchantability and Alkar breached that warranty when the Alkar oven exploded and caused damages to Advance Brands's Orange City facility. Alkar moves for summary judgment on Advance Brands's implied warranty of merchantability claim, arguing that proof of a manufacturing defect is a required element of such a claim.

"[A] warranty of merchantability 'is based on a purchaser's reasonable expectation that goods . . . will be free of significant *defects* and will perform in the way goods of that kind should perform.'" *Wright II*, 652 N.W.2d at 180-81 (quoting *Van Wyk*, 354 N.W.2d at 84) (emphasis in *Wright II*). Although a plaintiff can rely upon a manufacturing defect to state a claim for breach of implied warranty of merchantability, a plaintiff can also rely upon a design defect or a failure to warn. *See, e.g.*, Restatement (Third) of Torts: Products Liability § 2 cmt. n (noting a product defect claim satisfying the requisites of a manufacturing defect, a design defect or a failure to warn defect "may be brought under the implied warranty of merchantability provisions of the Uniform Commercial Code."); *see also Scott*, 774 N.W.2d at 505 n.2 ("[A] breach of warranty claim will require proof of the standard for either a manufacturing defect, a design defect, or a failure to warn."); *Wright II*, 652 N.W.2d at 180-81 (same). As discussed above, Advance Brands has raised genuine issues of material fact regarding its design defect and failure to warn claims. Consequently, the court declines to grant summary judgment on this ground.

## 2.     *Implied warranty of fitness for a particular purpose*

Iowa law also provides for an implied warranty of fitness for a particular purpose. Pursuant to Iowa Code section 554.2315,

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 554.2316 an implied warranty that the goods shall be fit for such purpose.

Recovery under this statute requires "proof of the following elements: (1) the seller had reason to know of the buyer's particular purpose; (2) the seller had reason to know the buyer was relying on the seller's skill or judgment to furnish suitable goods; and (3) the buyer in fact relied on the seller's skill or judgment to furnish suitable goods." *SmithCo Mfg., Inc. v. Haldex Brake Prods. Corp.*, 708 F. Supp. 2d 816, 820 (N.D. Iowa 2010).

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

Iowa Code Ann. § 554.2315 cmt. 2.

"The warranty of fitness under section 554.2315 is said to turn on the 'bargain-related' facts as to what the seller had reason to know about the buyer's purpose for the goods and about his reliance on the seller's skill or judgment in selecting them." *Van Wyk*, 345 N.W.2d at 84. Generally, the particular use may not be the use normally expected to be made of the goods. *See id.* at 85. "For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains." Iowa Code Ann. § 554.2315 cmt. 2. However, "in some cases a buyer's particular purpose will be the same as the ordinary purpose for which a product is furnished." *Van Wyk*, 345 N.W.2d at 85.

44

Alkar maintains that it is entitled to summary judgment on this claim because Advance Brands "did not communicate that the Alkar oven was to be used for a purpose other than heating food products." Alkar Br. at 25. Specifically, Alkar maintains Advance Brands "never notified Alkar that [it] intended to operate the oven with fluid trapped between isolation valves that Alkar neither specified nor supplied." *Id.* Advance Brands argues that Alkar designed the Alkar oven for the particular purpose of running Paratherm oil, Alkar knew it was necessary for Advance Brands to perform maintenance on the Alkar oven and the actions of Advance Brands's employees when performing maintenance on the Alkar oven were foreseeable to Alkar.

Construing the facts in the light most favorable to Advance Brands, Alkar had reason to know of Advance Brands's particular need to perform maintenance on the Alkar oven and that Advance Brands would sometimes need to perform maintenance with the isolation valves closed off to one or more zones of the Alkar oven. Furthermore, the court concludes that Advance Brands presented sufficient evidence that it relied on Alkar's skill to produce a suitable oven, and Alkar had reason to know that Advance Brands would so rely. Consequently, Advance Brands has presented sufficient evidence to support its claim for breach of implied warranty of fitness for a particular purpose, and the court denies summary judgment on this issue.

### D. Advance Brands's Negligence Claims

Advance Brands maintains that Alkar failed to address its negligence claims in the Motion, and as a result, Alkar is not entitled to summary judgment on that issue. Alkar counters by arguing that it is entitled to summary judgment on Advance Brands's negligence claims because Iowa courts have "done away with any distinction between strict liability and negligence." Reply at 12.

Before the Iowa Supreme Court decided *Wright II*, it was commonplace for plaintiffs to bring product defect cases under principles of both strict liability and

45

negligence. *See, e.g., Chown v. USM Corp.*, 297 N.W.2d 218, 219-223 (Iowa 1980). However, in *Wright II*, 652 N.W.2d at 167-69, the Iowa Supreme Court adopted the Products Restatement and removed the distinction between strict liability and negligence in product defect cases. The Iowa Supreme Court noted that, under the Products Restatement, strict liability is appropriate in manufacturing defect cases while negligence principles are more appropriate in other defective product cases. *Id.* at 168. Nonetheless, the Iowa Supreme Court emphasized that the Products Restatement has removed the necessity for traditional doctrinal categories because a court need only look to the requirements in the Products Restatement to determine whether a product defect claim exists. *Id.* at 169.

Although a plaintiff may bring a product defect claim under the label of negligence or strict liability, a court may not submit both a negligence claim and a strict liability claim based upon the same defect because both claims rest upon the same analysis provided in Section 2 of the Products Restatement. *Id.*; *see also Harley Davidson*, 2004 WL 370251, at *6 (noting the Iowa Supreme Court's preference not to label a design defect claim as one for strict liability or negligence, and finding it does not matter what theory the plaintiffs choose because plaintiffs were required to make the same showing under either theory). Thus, to the extent Advance Brands attempts to raise negligence claims based upon a manufacturing defect, design defect or failure to warn, such negligence claims are merged with its products liability claims, and the court will not consider an identical claim under two separate labels. To the extent Advance Brands raises any other negligence claims in its Complaint, those claims remain viable.

## VIII. CONCLUSION

For the foregoing reasons, the Motion (docket no. 102) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** to the extent it seeks summary judgment on Advance Brands's manufacturing defect claim. The Motion is **DENIED** with

respect to Advance Brands's remaining claims. The court merges Advance Brands's negligence claims with its products liability claims, to the extent its negligence claims are based upon a manufacturing defect, design defect or failure to warn.

**IT IS SO ORDERED.**

**DATED** this 10th day of May, 2011.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA